UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| WILLIE DOUGLAS, II | CIVIL ACTION NO. 07-cv-1351 |
| VERSUS | JUDGE HICKS |
| WARDEN LOUISIANA STATE PENITENTIARY | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

    Willie Douglas, II ("Petitioner") lived in the Haystack Apartments in Shreveport with Gwendolyn Remedies and another woman, together with Gwendolyn's two-year-old daughter Shacoria. Petitioner made a 911 call one afternoon in March 2000 to report that young Shacoria had fallen down the steps at the apartment complex and suffered a head injury. Shacoria was taken to the LSU Medical Center emergency room and then hospitalized in a pediatric intensive care unit. She died the next day. After an investigation, Petitioner was indicted for the first degree murder of Shacoria. He was convicted, but the jury could not reach a unanimous verdict on the imposition of the death penalty, so a mandatory life sentence was imposed.

    Petitioner pursued a direct appeal. State v. Douglas, 862 So.2d 390 (La. App. 2d Cir. 2003), writ denied, 872 So.2d 1080 (2004). He also filed in state court a post-conviction application. He now seeks federal habeas relief on the grounds that (1) there was insufficient evidence to support his conviction, (2) he had ineffective assistance of counsel, and (3) the

prosecution knowingly presented perjured testimony. It is recommended, for the reasons that follow, that the petition be denied.

**Sufficiency of the Evidence**

Beginning with the 911 call, Petitioner consistently maintained that Shacoria was injured when she fell down concrete stairs on the outside of the apartment complex as Petitioner prepared to take her, and two other children that he was babysitting, to the pool to swim. Petitioner was asked to describe the fall a number of times, and he gave a number of statements to police. He was consistent in saying that Shacoria fell down the stairs, but there were some variations in the details of the incident.

No one else testified that he or she witnessed the incident. A neighbor who lived in an apartment near the base of the stairwell testified that she did not hear or see anything consistent with Petitioner's description.

The State's case was built largely on the testimony of Dr. Steven Cogswell, who at the time of Shacoria's death was the Chief Deputy Coroner for Caddo Parish. Dr. Cogswell performed the autopsy on the victim, and he was qualified at trial as an expert witness in the field of forensic pathology. His testimony appears at Tr. 660-713.

Dr. Cogswell explained that when a child falls down stairs, even an entire flight, the tumble is actually a series of short falls. The child might miss the first one or two stairs, then hit the third stair down, and essentially tumble down, hitting each stair the rest of the way. Thus, there is an initial fall of a foot or two, followed by a series of nine or 10-inch short

falls. That is why such falls by small children usually result in some crying and maybe a scrape or two with no significant injuries. He said the result is about the same whether there was a short set of six stairs or a long set of 20 stairs, because each fall is so short.

Dr. Cogswell testified that Shacoria had two primary groups of injuries. The first and most critical was a closed head injury. There was a subdural hematoma, which Dr. Cogswell described as a collection or clot of blood outside the brain but inside the skull. It covered most of the right hemisphere of the child's brain. There were also areas of bleeding at a deeper layer called the arachnoid membrane. The brain itself was markedly swollen. The child also had hemorrhages in the retinal areas in the back of both eyes.

Dr. Cogswell testified that the head injury would have required a "severe amount of force," whether through impact of the head or by shaking. The retinal hemorrhages were also consistent with a non-accident cause. Dr. Cogswell next testified that studies have shown that a simple, single fall by a child, even from three to 10 feet, does not cause the rotational motion that is necessary to cause the type of brain injury suffered by Shacoria.

The other significant area of injury was the abdomen. The child's left, eleventh rib was broken, and her liver, which sits mostly on the right side underneath the rib cage and extends over to the left, was crushed (as opposed to being cut or torn), which caused extensive bleeding in the area. Dr. Cogswell testified that a small child's ribs are very flexible and can be squeezed almost flat before they break, so a great deal of force is required. He added that fractures caused by a blow or impact typically occur in more than

one rib because the ribs are only about a quarter-inch or so apart. He stated that if Shacoria's broken rib had been caused by impact he would expect to see a bruise or abrasion over it because of the very significant impact that would be required. The fracture without an overlying skin injury was more indicative of squeezing the rib cage flat until the rib broke. The vena cava, a large blood vessel that travels through the liver, had two very small tears and had also bled.

The child also had some bruises on her arms and chest or torso that were oval in shape and about the size of a fingertip. The distribution of the bruises was consistent with the shape and location of fingertips, as if someone had grabbed the child by the upper arm or around the chest, both of which would be seen in a child who was shaken. The child also had an abrasion on her back that was consistent with the child being on the floor or a hard surface and something applying enough downward pressure on her abdomen to crush her liver.

The child also had multiple abrasions on her forehead, face, back, and buttocks. Dr. Cogswell testified that they were each no more than an eighth of an inch, superficial, and probably represented the everyday bumps and scrapes of an active child's life. There were no skin tears.

The child did have a contusion or bruise on the left side of her forehead just above the eyebrow that was about an inch and a quarter in diameter. There was a fair amount of bleeding under the scalp but outside the skull. Dr. Cogswell opined that the wound was not consistent with a fall down the concrete set of steps because there were no breaks or tears in

the skin's surface that would be expected if there were impact with that hard and rough surface.

Dr. Cogswell testified that the child did not have skin injuries on the bony parts of her body such as her elbows, back of hand, knees, and the like that would be expected from a tumble down a set of concrete stairs. He gave his opinion that the overall injuries were not caused by a fall down a flight of stairs, or even from being thrown down a set of stairs, but were consistent with someone being beaten to death. He went further and gave his opinion that, without any doubt in his mind, Shacoria was beaten to death.

First degree murder includes the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm upon a victim who was under the age of 12. La.R.S. 14:30(A)(5). In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

This prosecution rested heavily on circumstantial evidence. A Louisiana statute provides that the prosecution has the burden of excluding every reasonable hypothesis of innocence. La.R.S. 15:438. A federal habeas court does not apply the Louisiana circumstantial evidence standard found in the statute. Only Jackson need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992).

The Louisiana appellate court cited and applied the Jackson standard on Petitioner's direct appeal, so its decision was not "contrary to" clearly established Federal law within the meaning of 28 U.S.C. § 2254(d). Thus, Petitioner can obtain habeas relief only if the State court's decision was an "unreasonable application" of Jackson. Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000); Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001).

Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Williams, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the state court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the state court decision was so wrong as to be objectively unreasonable. Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). And it is only the state court's ultimate

decision, not the quality of its analysis or opinion, that is at issue. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

The state appellate court conducted a searching review of the record and discussed at length the testimony of Dr. Cogswell, as well as the other evidence. It was persuaded that, despite the lack of eyewitnesses (to support the State or the defense version of events), there was sufficient evidence to find that Petitioner killed Shacoria while he possessed the specific intent to kill or inflict great bodily harm. The court noted that Petitioner was the only adult with the child at the time she was injured, Petitioner had variations in his accounts of the incident, Petitioner had exhibited some unusual behavior surrounding the event, there was no medical evidence that corroborated Petitioner's account of the fall down the stairs, and there was compelling forensic evidence from Dr. Cogswell that the child was brutally beaten to death. Those facts, viewed in a light more favorable to the prosecution, persuaded the state court that there was evidence of Petitioner's guilt beyond a reasonable doubt.

The undersigned, having set forth the relevant evidence above, need not engage in a lengthy analysis of this issue. It is apparent that there was ample evidence to satisfy the Jackson standard. This court certainly cannot say that the state court's application of Jackson to these facts was so incorrect as to be objectively unreasonable. Rather, the application appears to be entirely reasonable and consistent with the factual record and applicable law. No relief is permitted with respect to this claim.

**Ineffective Assistance of Counsel**

    **A. Introduction**

Petitioner argues that his trial counsel was ineffective for a number of reasons. Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel. Counsel's performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. 104 S.Ct. at 2068.

The test for habeas purposes is not whether a petitioner made the showing required under Strickland. The test is whether the State court's decision – that the petitioner did not make the Strickland showing – was so incorrect as to be contrary to, or an objectively unreasonable application of, the standards provided by Strickland's clearly established federal law. Wiggins v. Smith, 123 S.Ct. 2527, 2535 (2003).

    **B. Not Impeaching Dr. Cogswell**

Petitioner first argues that his appointed trial counsel, David McClatchey, was ineffective because he did not impeach Dr. Cogswell with the reports or testimony from Dr. John Odita, a radiologist. When Shacoria was taken to the hospital, Dr. Odita conducted a

radiological review of the skeleton and a CT survey of the abdomen. He wrote that the bone survey, which included the chest, showed no evidence of recent or old fractures. The CT scan indicated that the liver and other organs appeared normal, although there was a small amount of fluid in the abdomen. He noted no evidence of spleen or liver laceration. Tr. 1258-59. This is at odds with Dr. Cogswell's testimony that the child had a broken rib and crushed liver.

Petitioner raised this issue in his state post-conviction application, and the State's response included an affidavit from trial counsel. Mr. McClatchey testified that he used the service of various experts provided by the Indigent Defender Board to better understand the extensive medical reports in the case. He learned from the experts and other medical research that, although the broken rib and lacerated liver were not visible on the scans run by Dr. Odita during the emergency room efforts to save the child's life, there were indications even then that the child's liver was bleeding. He said that he learned that a broken bone is not always visible immediately on an x-ray or other scan, and it may take several days for the ends of a fracture to darken and become visible. McClatchey testifies that he knew an autopsy would necessarily reveal much more accurately the extent of injuries to both bones and organs, and to try and impeach Dr. Cogswell's autopsy findings with the radiology records would have only provided Cogswell an additional opportunity to detail the child's injuries for the jury. Moreover, the x-rays and CT scan did not show injuries that would have been present had the child fallen down a flight of steps, as Petitioner claimed in

his defense. In short, Attorney McClatchey was of the opinion that any testimony about the radiology reports would not have been exculpatory and would have allowed the State to beef up its own case. Thus, as a matter of trial strategy, McClatchey determined that it would not help the defense to call expert witnesses regarding the radiology reports. Tr. 1285-86.

The trial court judge recited the elements of a Strickland claim and concluded, without any discussion or analysis: "Therefore, Petitioner's claim is without merit and is, hereby, DENIED." Tr. 1268. The state appellate court summarized the claim, set forth the applicant's burden with regard to a Strickland claim, and rendered an equally conclusory decision: "This claim is meritless." Tr. 1332. The task of affording deference to a state court decision is made more difficult when no explanation for that decision is offered, but the federal court must nonetheless attempt to do so.

Counsel provided sound reasons for not attempting to use the radiology reports. Had he challenged Dr. Cogswell, for example, with regard to the broken rib, it would have afforded Dr. Cogswell the opportunity to focus the jury's attention on the gruesome autopsy photographs (which Petitioner also challenged the use of in his post-conviction application) to point out the evidence of the break. It also risks harming the credibility of counsel with the jury if he attempts a line of impeachment that is sure to be met with a solid explanation by the witness. Other attorneys may have chosen a different strategy, but the strategy employed by McClatchey was certainly reasonable, and the state court's application of Strickland to these facts was not objectively unreasonable.

### C. Not Impeaching Kathy Rushworth

Petitioner next argues that counsel was ineffective for not impeaching Kathy Rushworth, the Assistant Chief of Communications for the Shreveport Fire Department, who testified about the 911 call. She described how the calls were recorded, identified the tape, and said that it was her voice on the tape. The recording was then played for the jury. Defense counsel asked one question on cross-examination, whether it was Rushworth's voice on the tape. Ms. Rushworth answered, "Yes." Tr. 480-85. Petitioner argued in his post-conviction application that discovery documents showed that another employee actually took the 911 call. Attorney McClatchey testified in his affidavit that he had no indication that Ms. Rushworth was testifying incorrectly or he would have made every effort to impeach her. The state court denied the claim in the conclusory decisions cited above.

Whether it was Ms. Rushworth's voice on the tape or not, she was likely a competent witness to gain admission of the tape. If not, another witness could almost certainly have been summoned to lay the foundation for admitting the 911 recording. In any event, Petitioner has never articulated how this purported mistake prejudiced the defense. Even if counsel had employed the discovery documents cited by Petitioner to cross-examine and impeach Ms. Rushworth, there is no reasonable probability that Petitioner would have been acquitted. It simply was not important whose voice was on the receiving end of the 911 call.

### D. Not Calling a Child Witness

Petitioner next claims that counsel was ineffective because he did not call as a witness Callie Sherry Matthews. Defense counsel did file a motion for continuance before one trial setting, citing reasons including his recent viewing (for the first time) of a video-taped interview given by Callie, who was three years old at the time of the incident. Counsel reported in his motion that the child said during her interview that she saw the victim fall down the stairs. Counsel asked for more time to interview the witness and review the tape. Tr. 1260, 1262.

The State did not address this issue in its answer to the post-conviction application. Tr. 1270. And trial counsel did not address it in his affidavit. Petitioner continued to press the issue, including in his federal petition, Doc. 1, p. 21, but the State again did not address the claim.

Despite the lack of opposition, the claim faces a difficult burden. "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000). In addition, for Petitioner to demonstrate the requisite Strickland prejudice, "[he] must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial." Id. Petitioner has not demonstrated that the child witness could have been qualified to testify and that she would have given meaningful testimony favorable to the defense.

Out of an abundance of caution, the court called for supplemental filings on this issue. Both Petitioner and the State were allowed the opportunity to file affidavits or other evidence relevant to this claim. Doc. 21. The State filed an affidavit by trial counsel David McClatchey. Doc. 24. He testified that, just a few days before the case was set for trial, a prosecutor gave him a copy of a video interview with a very young child who was also being kept by Petitioner on the day of the death of the victim. McClatchey testifies that he watched the video, which had been recorded at the Gingerbread House (a local non-profit organization that serves abused children and assists in interviewing children in connection with criminal cases), and thereafter obtained a continuance of the trial so that he could conduct further review and confer with other attorneys about the new evidence.

McClatchey testifies that the video "was unclear, as the child was about three years old." She was "hard to hear and did not speak in complete sentences." The child did say something about "falling downstairs," but it was not clear whether she had witnessed the victim fall downstairs, had been told by Petitioner or someone else that the victim fell downstairs, or was referring to some other occasion regarding a fall down stairs. McClatchey thought the interview "was not a good one." He also observed that the child was supposed to have been inside the apartment at the time of the incident, where she could not have seen anything that might have happened on the stairs.

McClatchey testifies that he retained a child psychologist to review the video, and the expert was unable to reach any conclusion as to what the child meant when she referred to

"falling downstairs." McClatchey testifies that he attempted to locate the child witness but was not able to do so in time for trial. He concludes his testimony with a statement that his decision not to call the child witness (or an adult female who lived downstairs in the apartments) were part of his overall trial strategy, which focused on preventing the State from obtaining a death sentence.

Petitioner also filed a response to the court's order. Doc. 27. His response consists of a memorandum in which he sets forth at length the law regarding Strickland claims and a general assertion that counsel was at fault for not calling the child witness, which is said to have constituted the "only viable defense." Petitioner did not submit any affidavits or other evidence.

The child witness was by trial several months older (Shacoria died in March 2000; trial began in October 2002), but she would still be only 4 or 5 years old. Petitioner has not demonstrated that the child would have been remembered the events at issue, be deemed competent to testify in court, and deliver testimony favorable to the defense. Attorney McClatchey's affidavit reveals no likelihood that putting the child on the stand would have been of material benefit to the defense. McClatchey made a serious review of the child's statement and even retained a psychologist to assist in that review. He attempted, but was unable, to personally talk to the child before trial. In the end, he decided not to call the witness. The record demonstrates that this was a considered and reasonable trial decision by

McClatchey. Accordingly, Petitioner has demonstrated neither deficient performance nor prejudice on this Strickland claim.

**Prosecutorial Misconduct**

Petitioner's final claim is that the prosecutor knowingly used perjured testimony from Dr. Cogswell and Ms. Rushworth. The Due Process Clause of the Fourteenth Amendment forbids the prosecution to knowingly use, or fail to correct, perjured testimony. Giglio v. U.S., 92 S.Ct. 763, 766 (1972); Napue v. Illinois, 79 S.Ct. 1173, 1178-79 (1959). To prove that the prosecution has denied him due process of law by relying on perjurious testimony, a petitioner must prove that (1) a witness for the state testified falsely; (2) the state knew the testimony was false; and (3) the testimony was material. Knox v. Johnson, 224 F.3d 470, 477 (5th Cir. 2000), citing Giglio, supra.

Petitioner has no convincing evidence that Dr. Cogswell testified falsely. At best, Petitioner has some medical evidence that is not consistent with Dr. Cogswell's autopsy findings. A witness is not branded a perjurer merely because his testimony is not unimpeachable and without any conflicting evidence. Even defense counsel was persuaded that it was not worth attempting to impeach Dr. Cogswell with the medical evidence Petitioner points to.

With respect to Ms. Rushworth, there is no evidence that anyone in the courtroom was aware at the time Ms. Rushworth testified that she may have been mistaken about whose voice was on the recording. Moreover, the testimony on that point was far from material.

There has never been any indication that the recording was other than accurate, and evidence of the 911 call did not play a significant role in obtaining the conviction. The state trial and appellate courts rendered brief decisions on this issue in which they stated that Petitioner did not make a showing to support his claim. Tr. 1268, 1332. Petitioner has not demonstrated to this court that those decisions were so wrong as to be objectively unreasonable and warrant a new trial.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**, and that Petitioner's complaint be **dismissed with prejudice**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to

proposed factual findings and legal conclusions accepted by the district court. See <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 10th day of May, 2010.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE